IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| GERALDINE LOYA, individual and as personal representative of the estate of GREGORY DEAN LOYA; DOES 1-10, additional unnamed heirs or wrongful death beneficiaries of GREGORY DEAN LOYA,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br>SALT LAKE COUNTY; STATE OF UTAH; SALT LAKE COUNTY SHERIFF; COMMANDER OF THE SALT LAKE COUNTY ADULT DETENTION CENTER; JOHN DOES I-X, employees, officers or agents of the Salt Lake County ADC,<br><br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:05-CV-133-TC |

Plaintiff Geraldine Loya brought this 42 U.S.C. § 1983 civil rights action based on the

November 2002 death of her husband, Greg Loya, who committed suicide while a pre-trial

detainee at Salt Lake County's Adult Detention Center.[1]  In her complaint, she asserts two claims

of violation of § 1983 (cruel and unusual punishment, and violation of due process rights through

deliberate indifference to substantial risk of suicide); a claim, under 42 U.S.C. § 1985, of

conspiracy to violate constitutional rights; two claims under the Utah Constitution Article I

---

[1]Ms. Loya sues on her own behalf and as the personal representative of her husband's estate.  None of the Plaintiff DOES 1-10 has been identified so the court does not consider any of the Does to be parties to the action for purposes of the motion before the court.

Section 9 (cruel and unusual punishment, and "unnecessary rigor" (a type of substantive due process));[2] and a state-law-based claim of wrongful death.

The Defendants—Salt Lake County, the Salt Lake County Sheriff in his individual capacity, and the "commander" of the jail[3] in his individual capacity— have filed a motion for summary judgment on all of Plaintiff's causes of action.[4]  The Defendants contend, among other things, that no constitutional right was violated.  Also, the individual Defendants raise the defense of qualified immunity.  Finally, the Defendants contend that the Plaintiff's wrongful death claim is barred by the statute of limitations.

The court finds no evidence to show that a constitutional right has been violated. Accordingly, the Plaintiff does not have a viable claim under § 1983 or § 1985 and the court dismisses those claims.  Although Ms. Loya's wrongful death claim is not barred by the statute of limitations, the court declines to exercise supplemental jurisdiction over it.  Similarly, the court declines to exercise supplemental jurisdiction over the Plaintiff's state constitutional claims.  For these reasons, the Defendants' Motion for Summary Judgment is GRANTED IN PART AND

---

[2]Article I, Section 9 of the Utah Constitution provides, in relevant part, as follows: "[N]or shall cruel and unusual punishments be inflicted.  Persons arrested or imprisoned shall not be treated with unnecessary rigor."

[3]There is no such title or position at the ADC.  Plaintiff served Captain Robert Beemus with the (mistaken) understanding that he fit the bill.  As explained in more detail below, Captain Beemus does not appear to be the individual who meets the description in Plaintiff's Complaint at Paragraph 6.

[4]Although the State of Utah was named as a defendant, the State was never served. During the hearing, counsel for Plaintiff acknowledged that Plaintiff was not pursuing any claims against the State.  Accordingly, under Rule 4(m) of the Federal Rules of Civil Procedure, the State of Utah is dismissed without prejudice.  Also, none of the JOHN DOES 1-X has been named, so the court does not consider any of them to be parties for purposes of the motion before the court.

DENIED IN PART.

# I. FACTUAL BACKGROUND[5]

## Mr. Loya's Suicide

On November 17, 2002, Greg Loya was arrested by Sergeant Shawn Judd of the Utah

Highway Patrol and booked into the Salt Lake County Adult Detention Center ("ADC" or "Jail")

on felony and misdemeanor charges.  As a matter of routine practice, Sergeant Judd would ask

his prisoners whether they were having any suicidal thoughts.  If he received an affirmative

response, he noted it on the Jail booking fact sheet, told the Jail officers, and included it in his

arrest report.  Neither Mr. Loya's Jail booking fact sheet nor Sergeant Judd's arrest report reflects

that Mr. Loya ever told the officer about having suicidal thoughts.

Before Mr. Loya was officially booked into the Jail, he was "pre-screened" by Michelle

Barlocker, a registered nurse on staff at the Jail.  A "pre-screening" is an initial medical and

mental health screening by a registered nurse to determine whether the Jail will accept the

arrestee as a prisoner.  The pre-screening assessment included an evaluation of whether an urgent

mental health evaluation was necessary.  During the pre-screening, Mr. Loya was asked a series

of questions about his medical and mental health.  Those questions were taken from a

standardized checklist put together by the Jail. The examiner marked his responses on the form.

The mental health questions included queries such as whether Mr. Loya had a history of mental

illness, whether he had attempted suicide before, and whether had any suicidal intent or ideation.

If Mr. Loya had answered "yes" to any of the mental health screening questions, or if he

---

[5]There is no genuine issue of material fact.  The relevant facts are taken from both parties' briefs.

had shown any abnormal affect, speech, or behavior, Ms. Barlocker would have referred him to

another medical professional for an "urgent" mental health evaluation.  But he expressly denied

any history of mental illness, previous suicide attempts, or suicidal thoughts or intent, and,

according to the pre-screening nurse, his behavior and manner were normal.  Instead of referring

him for an urgent mental health evaluation, the nurse scheduled Mr. Loya for a routine mental

health examination because he was taking an anti-anxiety medication.  (He took his own life

before that evaluation could be performed.)

Approximately five hours later, another registered nurse, Gail Smith, conducted a "post-

screening" of Mr. Loya.  Registered nurses at the Jail perform "post-screening" evaluations on

any prisoner who will not be released from the Jail within a few hours of booking.  The "post-

screenings" are more comprehensive medical and mental health assessments used to determine

whether an arrestee should be placed in the general population of the Jail.  The post-screening

registered nurse uses a checklist and asks the prisoner a series of questions about his mental and

physical health.  During the post-screening, the nurse asks the prisoner whether he agrees with

the responses recorded during the pre-screening interview.  Then the same questions are repeated

and the responses are checked against the responses to pre-screening questions.  If the responses

are inconsistent with the earlier responses or if the prisoners answers "yes" to any of the

questions, the post-screening nurse refers him to a mental health professional for further

evaluation.  After the post-screening, the nurse decides whether the prisoner should be placed in

the general population and whether medical, mental, or dental treatment is necessary.

Mr. Loya, when questioned by Ms. Smith, agreed with his earlier responses to the pre-

screening questions and again denied any suicidal thoughts or intent, earlier suicide attempts, and

4

mental illness history.  According to the records, the registered nurse did not notice anything unusual about Mr. Loya's behavior.  Given the answers he provided, as well as his behavior, Ms. Smith recommended that he be placed in the Jail's general population.

After the two screenings, and after being informed about how to obtain medical and mental health care at the Jail, Mr. Loya was placed in Unit 5 of "C Pod" (a "pre-classification unit") where prisoners are relatively free to roam during designated hours of the day.

During the two days he was confined in C Pod, Mr. Loya did not request medical or mental health assistance, although he apparently knew how to do so, because during previous incarcerations, he submitted several "Sick Call Request" forms.  During the two days of his confinement, he had four telephone conversations with his wife, but he never told her that he was having suicidal thoughts.

On November 19, 2002, Officer Leonard Wolfgramm, the housing officer on duty, noted that earlier in the day, he passed Mr. Loya's cell twice during the officer's "watch tours," and did not observe any behavior that suggested Mr. Loya was suicidal.  Nor did Mr. Loya express any desire or intent to Officer Wolfgramm to take his own life.

But during the afternoon of November 19, 2002, Mr. Loya jumped over a handrail from a second floor tier to a concrete floor fifteen feet below. Despite immediate attempts to revive him, Mr. Loya died on the Jail floor as a result of serious head trauma.

**Mr. Loya's Earlier Attempted Suicide**

Ms. Loya stresses the fact that the screening nurses did not check Mr. Loya's previous jail records, which would have revealed a report that Mr. Loya attempted to commit suicide at the Jail one month before.  According to those records, on October 17, 2002, Mr. Loya, while in his

cell, wrapped a sheet around the top of the bunk bed and around his neck.  Then he kneeled on the floor, putting pressure on the sheet around his neck to keep it taut.  A guard found him in that position.  Mr. Loya was treated on scene by medical professionals, and then he was taken to the hospital where he was examined.  He had no lingering physical problems from the suicide attempt, and a few hours later he was released on bond.[6]

Although the Jail personnel failed to review the earlier records, there is no evidence of an affirmative decision, much less policy, to ignore such records.  Nevertheless, the policy for screening prisoners for suicide risk does not contain any requirement to review previous jail records.

**Captain Robert Beemus**

At the time of Mr. Loya's death, Captain Robert Beemus (who was named as the Defendant the Plaintiffs title "Commander of the Salt Lake County Adult Detention Center") was the captain of the Jail Housing Division.  All captains assigned to the Jail are supervised by the Chief Deputy of the Corrections Bureau.  Jail captains, including Captain Beemus, do not promulgate policy at the Jail.  As captain of the Jail Housing Division, Captain Beemus was responsible for managing almost 200 correctional officers who are assigned to guard prisoners.  His direct supervision was limited to four lieutenants in the division.

---

[6]The October 2002 records of the suicide attempt note that officials did not believe Mr. Loya was actually attempting suicide.  The report suggested that Mr. Loya may have "feigned his injuries in an attempt to get out of jail."  (Defs.' Reply at 3.)  Based on the report, the Defendants contend that Mr. Loya may have denied any earlier suicide attempts during the screenings on November 17, 2002, because he too did not view the October incident as a true suicide attempt.  But there is no evidence of what Mr. Loya thought about the October incident.  Because inferences should be drawn in favor of the non-moving party, the court considers the October 2002 incident to be an actual suicide attempt.

In 2002, the medical and mental health needs of incoming prisoners, such as Mr. Loya, were evaluated by registered nurses in the Jail Services Division of the ADC.  The registered nurses were supervised directly by the Director of Nursing at the Jail and indirectly supervised by the captain assigned to the Jail Services Division (i.e., someone other than Captain Beemus).

Captain Beemus was not aware that Mr. Loya was incarcerated in the Jail in November 2002 until after Captain Beemus was told of Mr. Loya's suicide.  Captain Beemus had no direct contact with Mr. Loya when Mr. Loya was incarcerated in October and November 2002.  He did not evaluate Mr. Loya's medical or mental health needs and did not participate in the decision to place Mr. Loya in the general population of the Jail in November 2002.  He did not directly supervise any employee who evaluated Mr. Loya or who decided to place Mr. Loya in the general population.  In fact, those employees were supervised by a different individual in a different division of the Jail.

**Sheriff Aaron Kennard**

The Salt Lake County Sheriff at the time of Mr. Loya's death was Aaron Kennard. Sheriff Kennard managed the Jail through his supervision of the Chief Deputy of the Corrections Bureau.  There is an absence of evidence in the record about what, if any role, Sheriff Kennard played in promulgating policy concerning screening of incoming prisoners.  There appears to be no dispute that Sheriff Kennard had no direct contact with Mr. Loya at any of the relevant times.

## II. PROCEDURAL BACKGROUND

 Mr. Loya's widow, Geraldine Loya, filed this lawsuit claiming constitutional right violations and wrongful death.  Under the Utah Governmental Immunity Act (UGIA), she gave notice of the wrongful death claim to the County on November 18, 2003, within one year of the

date of Mr. Loya's suicide.  The County did not respond within ninety days, and so by law the claim was deemed denied on February 17, 2004.  The Plaintiff then filed her claim in this court on February 16, 2005.

She does not bring suit against the officers or nurses who had direct contact with Mr. Loya.  Rather, she focuses on the County itself, as well as the Salt Lake County Sheriff (Aaron Kennard at the time) and what she terms the "Commander of the Salt Lake County Adult Detention Center" (there is no such title or position of "Commander" at the ADC).  The Plaintiff served the County, the Sheriff, and Captain Beemus (who was captain of the Jail Housing Division).  The Sheriff and Captain Beemus are named as defendants in their individual as well as official capacities.

The Plaintiff served Captain Beemus, believing he matched the description of the "Commander of the Salt Lake County Adult Detention Center" described in the Complaint as follows:

> Defendant COMMANDER OF THE SALT LAKE COUNTY ADULT DETENTION CENTER, individually and in official capacity, is and was at all times relevant to the allegations contained in this complaint the commander or warden of the Salt Lake County Adult Detention Center.  As warden, this Defendant was responsible for the policies, practices and customs of the ADC. This Defendant was also responsible for the hiring, training, control, supervision, and discipline of those persons employed by the ADC.  This Defendant was supervised by Defendant SALT LAKE COUNTY SHERIFF.

(Compl. ¶ 6 (caps in original).)  But during the hearing on the motion for summary judgment, counsel for the Plaintiff essentially conceded that Captain Beemus may not be the appropriate person to be served as a Defendant.  Still, no one else has been served or identified.

8

# III. ANALYSIS

## A.   Legal Standards

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c);  see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986);  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."  Liberty Lobby, 477 U.S. at 252; see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.").

In this case, the Defendants have raised the defense of qualified immunity in a motion for summary judgment.  Given the underlying purposes of qualified immunity,[7] courts address

---

[7]Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to

qualified immunity questions differently from other summary judgment decisions.  Medina v.

Cram, 252 F.3d 1124, 1128 (10th Cir. 2001).  When a defendant asserts a qualified immunity

defense, the burden shifts to the plaintiff, who must meet a "heavy two-part burden."  Id.

(citations omitted).

Plaintiff must first establish that the facts, taken in the light most favorable to plaintiff,

show that the conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

"If no constitutional right would have been violated were the allegations established, there is no

necessity for further inquiries concerning qualified immunity."  Id., quoted in Cortez v.

McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007).  But if Plaintiff establishes a violation of a

constitutional or statutory right, "the next, sequential step is to ask whether the right was clearly

established."  Saucier, 533 U.S. at 201.

For the non-qualified-immunity issues (e.g., claims against the County), the Defendants

(who do not bear the burden of persuasion) have the initial burden of "pointing out to the court a

lack of evidence on an essential element of the non-movant's claim."  Adler v. Wal-Mart Stores,

Inc., 144 F.3d 664, 671 (10th Cir. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325

(1986)).  The moving party need not present evidence showing the absence of a genuine issue of

material fact.  "Instead, . . . the burden on the moving party may be discharged by 'showing' –

that is, pointing out to the district court – that there is an absence of evidence to support the

nonmoving party's case."  Celotex, 477 U.S. at 325.  If that is done, the non-movant may not rely

---

trial."  Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511,
526 (1985)).  Accordingly, immunity questions should be addressed at the earliest possible stage
in litigation.  Id. (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam)).

on the pleadings to survive a motion for summary judgment; it must present specific facts supported by admissible evidence "from which a rational trier of fact could find for the nonmovant."  Adler, 144 F.3d at 671.

**B.     Ms. Loya's Federal Claims**

**1.     Cruel and Unusual Punishment Under the Eighth Amendment**

A claim of cruel and unusual punishment under the Eighth Amendment is only available to convicted prisoners, not pre-trial detainees.  Pre-trial detainees are defined as "those persons who have been charged with a crime but who have not yet been tried on the charge."  Bell v. Wolfish, 441 U.S. 520, 523 (1979).  Because Mr. Loya was a pre-trial detainee, the Plaintiff's claim under the Eighth Amendment is DISMISSED.  See, e.g., Berry v. City of Muskogee, Oklahoma, 900 F.2d 1489, 1493 (10th Cir. 1990) ("The rights of pretrial detainees . . . are not controlled by the cruel and unusual punishment clause of the Eighth Amendment because the Fifth and Fourteenth Amendments prohibit punishment 'prior to an adjudication of guilt in accordance with due process of law.'") (quoting Bell, 441 U.S. at 535).

**2.     Due Process Claim Under 42 U.S.C. § 1983**

Ms. Loya did bring a parallel claim that is available to pre-trial detainees under the due process clause of the Fourteenth Amendment.  "Under the Fourteenth Amendment's due process clause, pretrial detainees . . . are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eight Amendment."  Id. at 867.

"[C]laims based on a jail suicide [of a pre-trial detainee] are considered and treated as claims based on the failure of jail officials to provide medical care for those in custody."  Barrie v. Grand County, Utah, 119 F.3d 862, 866 (10th Cir. 1997).  Accordingly, the "deliberate

indifference to serious medical needs" test of <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), applies here.  <u>Id.</u>

To survive the Defendants' motion for summary judgment, Plaintiff must present evidence of deliberate indifference to a known or obvious substantial risk of suicide.  <u>Barrie</u>, 119 F.3d  at 869.  According to the Tenth Circuit, deliberate indifference,

> while requiring a higher degree of fault than negligence, or even gross negligence, remains lower than the intentional and malicious infliction of injury reflected in the <u>Whitley [v. Albers</u>, 475 U.S. 312 (1986)] standard.  We therefore hold that an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights.

<u>Berry v. City of Muskogee</u>, 900 F.2d 1489, 1496 (10th Cir. 1990) (internal citation omitted).

a. <u>Whether Violation of a Constitutional Right Occurred</u>

The Plaintiff (Mr. Loya's widow) does not bring suit against the arresting officer and Jail employees who actually questioned, examined and monitored Mr. Loya.  Rather, Plaintiff targets the County for its screening policy and two officials who she contends promulgated the policy and supervised the individuals who carried out the policy.

According to the Plaintiff, "[t]he sheriff and jail commander . . . are those individuals with responsibility for the policy at the jail; the [County] policy . . . was not to review any mental health history or prior suicide attempts at the jail as part of a mental health screening."  (Pl.'s Opp'n Mem. at 14.)  The Plaintiff also contends, without evidentiary or expert witness support, that it is "axiomatic that having a policy that fails to take into account prior suicide attempts at the same facility as part of the mental health screening process disregards a known or obvious risk."  (<u>Id.</u>)  She further alleges that "a known and obvious risk of not conducting an adequate

12

suicide risk assessment on a suicidal detainee is a substantial risk of that detainee committing suicide." (Id. at 9.)  In other words, according to Ms. Loya, the Defendants knew or should have known that their suicide screening policy was not adequate because it would not effectively identify suicidal detainees. Ms. Loya contends that if the jail employees had simply reviewed Mr. Loya's earlier jail records, they would have had sufficient information to question Mr. Loya's denial of suicidal tendencies and they would have referred him for an urgent mental health evaluation rather than placing him in the general population.  That failure, she says, was a direct result of the inadequate screening policy and constituted deliberate indifference.

The court disagrees.  Although the evidence shows that the County did not include a review of previous jail records as part of its screening policy, Ms. Loya has not shown that any of the Defendants acted with deliberate indifference to a known and substantial risk of suicide.

As the Tenth Circuit stated, "an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." Id. (emphasis added).  Even if Ms. Loya has established the existence of an inadequate screening policy, the policy as it stands, and the way it was carried out, do not constitute deliberate indifference.

Three cases concerning prisoner suicides support the court's conclusion.  First, in Barrie v. Grand County, Utah, 119 F.3d 862 (10th Cir. 1997), the court held that Grand County, its sheriff, and other individuals, did not act with deliberate indifference toward a prisoner who committed suicide in the county jail.  In Barrie, the inebriated defendant, when booked at the jail, was asked "whether he had tried to hurt himself in the past, attempt suicide, or was contemplating suicide."  He shook his head and said "no." Id. at 865.  Then he was placed in the

jail's "drunk tank."  A few hours later, the on-duty officer checked on the prisoner in his cell.  "In response to [the officer's] question as to how he was doing, [the prisoner] said 'alright' and appeared 'fine' to [the officer]." Id.  Two hours later, the officer checked on the prisoner again and found him "moving around" in his cell.  Id.  One hour later, the officer checked on the prisoner and found him dead, hanging from the sweat pants draw cord he was wearing when placed in the cell.  Under those facts, which show less effort than the County's effort with Mr. Loya, the court found that the actions of the defendants did not rise to the level of deliberate indifference.

In Gaston v. Ploeger, 229 Fed. Appx. 702 (10th Cir. 2007), the Tenth Circuit addressed a pre-trial detainee suicide case under § 1983, in which the plaintiffs alleged deliberate indifference against the sheriff, prison sergeant, prison guard, and others.  In Gaston, the prisoner was incarcerated in the Brown County Jail awaiting trial.  For the first six weeks, he was well-behaved.  Then he received a letter from his "significant other" (but it was not a "Dear John" letter).  He also was caught tampering with a cell window in an apparent attempt to obtain contraband.  Because of that, the jail sergeant moved him to a different cell.  The prisoner became belligerent and insubordinate. Then he covered the window of his cell with paper (a practice permitted only for a short time to afford the prisoner some privacy when needed).  But when the paper remained longer than it should have, the officer on duty became concerned. Because two officers were required to enter an inmate's cell, the officer on duty had to wait for another officer to arrive.  They were going to place him in a "suicide watch cell" that was also used to observe inmates who were intoxicated or injured.  While waiting for another officer's arrival, the officer communicated with the prisoner a few times.  When another officer still had

14

not arrived more than an hour later, the officer on duty enlisted the help of a trustworthy inmate to enter the cell and remove the paper from the window.  They found the prisoner dead, hanging by a sheet from the door handle.

The jail employees had no sign that the prisoner was suicidal.  The other inmates did, but they did not inform any jail employee.  The record also showed that the officer who found the prisoner had not yet received training on suicide prevention despite the fact that he had been on the job for eighteen months.  The plaintiffs alleged deliberate indifference through conduct and jail policies, as well as failure to supervise and train.

The Gaston court noted that there was a "subjective component" of the deliberate indifference test, which required a "showing that the defendant acted with a culpable state of mind."  Id. at 710.  Quoting the United States Supreme Court, the court said that "a prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. (quoting Farmer v. Brennan, 511 U.S. 825, 836 (1994)).  The Tenth Circuit then said the United States Supreme Court "made clear that the defendant's knowledge of a substantial risk may be proven by circumstantial evidence, including evidence 'that the risk was obvious.'  However, the threshold for obviousness is very high."  Id. (internal citations omitted).

The court noted that there was no evidence that the jail sergeant was aware of any suicidal behavior.  The court rejected the inference that "if the jailers had been properly monitoring the inmates, the jailers would have heard [the prisoner] talk about suicide, would have observed [him] give away his food, would have watched [him] repeatedly rock back and forth on his bed,

15

and would have noticed [him] tying his shoelaces together to test the ability of the shoelaces to hold his body weight."  Id. at 711.  The court then held that "[b]ecause there is no evidence that [the jail sergeant] considered [the prisoner] suicidal, he could not have been deliberately indifferent to the risk of suicide."  Id. at 712.  The court found that the sheriff, who was "ultimately responsible for the operation" of the jail and conduct of its employees, was not liable because the record did not contain "evidence from which a jury could infer that [the sheriff] knew that his policies were insufficient to protect inmates from the risk of suicide."  Id. at 713.  The court found that, "in hindsight, it is clear that [the sheriff] could have better trained and supervised his subordinates."  Id.  But the court found that this did not rise to the level of deliberate indifference.

Finally, the case of Tittle v. Jefferson County Comm'n, 10 F.3d 1535 (11th Cir. 1994), is persuasive.  In that case, the plaintiffs charged the county with policies that were deliberately indifferent to prisoners' risk of suicide.  According to the plaintiffs, the county was deliberately indifferent because it "failed both to correct its defectively designed jail cells and to provide for sufficient screening of inmates for suicidal tendencies."  Id. at 1536.  The facts in the Tittle case are very similar to the case before this court.  The jail's screening procedures included a medical examination of incoming prisoners.

> In addition, a deputy sheriff filled out a form that included questions regarding a prisoner's suicidal tendencies.  If a prisoner's answers demonstrated suicidal tendencies, the jail personnel were to place that prisoner in the medical ward of the jail for constant supervision.  During Tittle's screening, he answered that he had never been under the care of a psychiatrist, had never attempted suicide, was not dependent on drugs or alcohol, was not using street drugs, and had no serious illness or injury.  The deputy noted that Tittle exhibited no abnormal or unusual behavior.  Based on the results of his screening, jail personnel placed Tittle in the general population of the jail.

Id. at 1537.  Approximately three days later, the prisoner was found dead in his cell from

hanging.  Another prisoner whose case had been consolidated with Tittle's, went through the

same screening procedures, falsely answered the questions with a "no," and appeared normal to

the jail employees.  He committed suicide eight days after he was booked into the jail.  He had

previously attempted suicide and apparently one of his childhood friends called the jail and told

someone at the jail that the prisoner had attempted to commit suicide and might do it again.  That

information was not communicated to the relevant authorities.  Also, despite documentation of

previous suicides and suicide attempts by other inmates at the jail, the court found the record was

"silent on the question of whether any County representative knew, prior to [the second

prisoner's] suicide, about any of the [documented] suicide attempts or suicides" at the jail.  Id. at

1538.

     The Tittle court rejected the plaintiffs' argument that "the policies to prevent inmate

suicide that were in place at the jail at the time of [the two inmates'] suicides were so inadequate

as to constitute a violation of the decedents' constitutional rights. . . .  The plaintiffs have pointed

to what they perceive to be weaknesses in the screening process, the training of deputies and the

supervision of prisoners; however, these alleged weaknesses, without more, do not amount to a

showing of deliberate indifference towards the rights of prisoners."  Id. at 1540 (emphasis

added).

     In all of the cases discussed above, the facts were arguably more egregious than the facts

here.  No deliberate indifference was found in those cases, and the court does not find any here.

The record simply does not reflect a callous disregard of a known risk of suicide.  Accordingly,

Ms. Loya has not established a constitutional violation.

Along the same line, she has not presented evidence of supervisor liability either.  "In order to establish a § 1983 claim against a supervisor for the unconstitutional acts of his subordinates, a plaintiff must first show the supervisor's subordinates violated the constitution." Serna v. Colo. Dep't of Corrections, 455 F.3d 1146, 1151 (10th Cir. 2006).  Here, Ms. Loya has not established that the Jail employees violated the Constitution when they screened and placed Mr. Loya in the Jail's general population without referring to his past jail records.  Consequently, even if Ms. Loya had evidence that the employees were Sheriff Kennard's and Captain Beemus's subordinates, she has not satisfied her burden concerning supervisor liability under § 1983.

It is also fatal to her claim that she has not presented any evidence that the individual Defendants had anything to do with the adoption or implementation of the screening policy (whether it reflected a conscious choice to omit review of previous jail records or not).  That is, even if she had demonstrated that the Jail employees violated Mr. Loya's constitutional rights, she has not shown the requisite "'affirmative link' between the supervisor and the violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." Id.  ("Because 'mere negligence' is not enough to hold a supervisor liable under § 1983, a plaintiff must establish that the supervisor acted knowingly or with 'deliberate indifference' that a constitutional violation would occur.").

No one disputes that the Sheriff and Captain Beemus were not personally involved with Mr. Loya's screening or detention in the Jail's general population.  And it is undisputed that Captain Beemus does not make policy decisions for the Jail and was not even aware of Mr. Loya's detention or suicide until after the suicide occurred.  As for Sheriff Kennard, Ms. Loya

18

presents no evidence that he had anything to do with the screening policy.  Given the lack of

evidence of personal involvement by either individual, Ms. Loya simply has not satisfied her

burden.

> b.     Whether there is Evidence of Municipal Liability

The County is not liable under § 1983.  "[I]n enacting § 1983, Congress did not intend to

impose liability on a municipality unless deliberate action attributable to the municipality itself is

the 'moving force' behind the plaintiff's deprivation of federal rights."  Board of County

Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 400 (1997) (emphasis in original)

(citing Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978)).

First, as noted above, Ms. Loya has not presented evidence of a deprivation of Mr. Loya's

constitutional rights.  Second, she has not provided evidence of an affirmative policy to ignore

past medical history of return prisoners.  See Bryan County, 520 U.S. at 403 ("[I]n Monell and

subsequent cases, we have required a plaintiff seeking to impose liability on a municipality [or

other local government bodies] under § 1983 to identify a municipal 'policy' or 'custom' that

caused the plaintiff's injury.").  Third, there is no evidence of the culpability required to find

liability under § 1983.  See id. at 404 (plaintiff "must also demonstrate that, through its deliberate

conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff

must show that the municipal action was taken with the requisite degree of culpability and must

demonstrate a direct causal link between the municipal action and the deprivation of federal

rights") (emphasis added).

For all the foregoing reasons, the Defendants are entitled to summary judgment on Ms.

Loya's § 1983 claims.  Accordingly, those claims are DISMISSED.

### 3.   Claim of Conspiracy Under 42 U.S.C. § 1985

Plaintiff has conceded her § 1985 claim of conspiracy.  She says she "does not oppose

Defendants' arguments concerning claims for conspiracy under 42 U.S.C. 1985."  (Pl.'s Opp'n

Mem. at 15.)  Based on a review of the briefs and relevant case law, as well as Ms. Loya's

concession, the court DISMISSES her claim under 42 U.S.C. § 1985.

### C.   Ms. Loya's State Claims

### 1.   State Law Claim of Wrongful Death

Defendants assert that the statute of limitations bars Ms. Loya's wrongful death claim.

They rely on the two-year statute of limitations "for recovery of damages for a death caused by

the wrongful act or neglect of another."  Utah Code Ann. § 78-12-28(2).  But that section applies

to claims that are brought against private parties, rather than a governmental entity or its

employees.

Instead, the applicable statute of limitations is set forth in the Utah Governmental

Immunity Act (UGIA) that was in effect at the time of Mr. Loya's suicide.  The UGIA provides

in relevant part as follows:

> A claim against a political subdivision, or against its employee for an act or
> omission during the performance of the employee's duties, within the scope of
> employment, or under color of authority, is barred unless notice of claim is filed
> with the governing body of the political subdivision according to the requirements
> of Section 63-30-11 within one year after the claim arises . . . .

Utah Code § 63-30-13 (2003) (emphasis added).  Under the UGIA, a "claim arises when the

statute of limitations that would apply if the claim were against a private person begins to run."

Utah Code Ann. § 63-30-11(1) (2003).

In this case, the claim arose when Mr. Loya committed suicide on November 19, 2002.

20

Plaintiff filed her notice on November 18, 2003, within the one-year period.  Then, because no

response was received from the County, the claim was deemed denied ninety days after the notice

was filed – in this case, on February 17, 2004.  Utah Code § 63-30-14 (2003).  At that point, the

Plaintiff had one year to file her cause of action.  See Utah Code § 63-30-15(2) (2003) ("The

claimant shall begin the action within one year after denial of the claim or within one year after

the denial period specified in this chapter has expired . . . .").   The Plaintiff filed her claim in this

court on February 16, 2005.  Accordingly, her wrongful death claim is not barred by the statute of

limitations.

    But the court, under 28 U.S.C. § 1367(c)(3), declines to exercise supplemental

jurisdiction over Ms. Loya's wrongful death claim because all claims over which the court had

original jurisdiction have been dismissed.[8]

### 2.    Claims Under Article I, Section 9 of the Utah Constitution

    Defendants further contend that the state constitutional claims fail because the federal

constitutional claims fail.  (See Defs.' Mem. Supp. Mot. Summ. J. at 35-37.)  Plaintiffs agree that

the fate of the state law claims are linked to the fate of the federal claims because essentially the

---

    [8]Defendants assert in the alternative that the wrongful death claim is barred because the
government did not waive immunity from suit for "injury proximately caused by a negligent act
or omission of an employee committed within the scope of employment . . . if the injury arises
out of, in connection with, or results from assault battery, false imprisonment, false arrest,
malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference
with contract rights, infliction of mental anguish, or violation of civil rights."  Utah Code § 63-
30-10(a) (2003) (emphasis added).  The Defendants contend that because Ms. Loya alleges that
Mr. Loya's suicide was an injury arising out of a violation of civil rights, governmental immunity
from liability for the wrongful death claim was not waived.  This argument was raised in the
Defendants' reply brief, so the Plaintiff did not have an opportunity to address this issue.
Regardless, the court does not reach the issue because the court declines to exercise supplemental
jurisdiction.

same standards apply.  (See Opp'n Mem. at 15.)  Whether the parties are correct or not, the court

will not address the merits of the state constitutional claims because it declines to exercise

supplemental jurisdiction over them.

## ORDER

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Dkt # 41) is

GRANTED IN PART AND DENIED IN PART as follows:

1.      Ms. Loya's federal claims under 42 U.S.C. § 1983 and § 1985 are DISMISSED.

2.      Ms. Loya's wrongful death is not barred by the statute of limitations.  But the

court declines to exercise supplemental jurisdiction over that state-law-based cause of action, so

it is DISMISSED WITHOUT PREJUDICE.

3.      Because the court declines to exercise supplemental jurisdiction over the

Plaintiff's state constitutional law claims, they are DISMISSED WITHOUT PREJUDICE.

4.      The State of Utah is DISMISSED WITHOUT PREJUDICE under Rule 4(m) of

the Federal Rules of Civil Procedure.

DATED this 8th day of April, 2008.

BY THE COURT:

TENA CAMPBELL
Chief Judge